IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) 1:17-cr-270 (LMB) |
| UMAR FAROOQ CHAUDHRY, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION

Before the Court is defendant Umar Farooq Chaudhry's ("defendant" or "Chaudhry") "Motion to Dismiss Indictment for Violating the Sixth Amendment Right to a Speedy Trial and Rule 48" ("Motion to Dismiss the Indictment") [Dkt. No. 165]. More specifically, defendant argues that he is entitled to relief because the government filed a criminal complaint and obtained an arrest warrant for him on December 23, 2009; however, it waited almost eight years to seek an indictment, which was filed on November 16, 2017, and did not formally request his extradition from Pakistan until August 26, 2020. Id. at 3. In opposition, the government argues that defendant cannot satisfy the test set forth in Barker v. Wingo, 407 U.S. 504 (1972), to warrant dismissal of his Indictment. For the reasons stated during oral argument and more fully explained within this Memorandum Opinion, defendant's Motion to Dismiss the Indictment has been denied.

I. BACKGROUND

On November 16, 2017, Chaudhry along with Ahmed Ameer Minni, Ramy Said Zamzam, Aman Hassan Yemer, and Waqar Hussain Khan were indicted for conspiring to provide material support to terrorists in violation of 18 U.S.C. § 2339A (Count One), attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339A

(Count Two), conspiring to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B (Count Three), and attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B (Count Four). [Dkt. No. 10]. These charges arose out of defendants flying to Pakistan for the purpose of going onward to Afghanistan to defend Muslims against American and other foreign troops. [Dkt. No. 2] at 4. Before their departures from Northern Virginia, Zamzam, assisted by Minni, recorded a "Final Message" video explaining the reasons for the defendants' trip. Among the reasons cited was the need for Muslims to go overseas and assist their fellow Muslims physically, by fighting, which was described as a religious obligation. Id. at 2-3. When the defendants left the United States, almost no one knew of their plans.[1]

On December 9, 2009, shortly after the defendants arrived in Pakistan, Pakistani authorities arrested all five defendants in a house belonging to Chaudhry's cousin. Id. at 5. On December 10, 2009, the United States' Assistant Legal Attaché in Pakistan ("ALAT") interviewed the defendants for the first time. The FBI also immediately sent a team of agents to attempt to interview defendants. From December 10, 2009 through December 19, 2009, the FBI conducted nine interviews of the defendants. During those interviews, defendants Minni and Khan made numerous admissions, including that a recruiter had contacted Minni to arrange for the group to travel to Pakistan and instructed him on how to travel in Pakistan in a manner that would not arouse suspicion. Id. at 5-6. Minni also admitted that everyone in the group supported the goal of fighting American troops in Afghanistan. Id. at 6. During Chaudhry's interview, he stated that "we came for the sake of Islam to work with the Muslims" and added, "I

---

[1] The FBI first became aware of these defendants on December 1, 2009 after their families came forward to report that their sons were missing. The family members provided the FBI with a USB that contained the video file named "afinalmessage." [Dkt. No. 2] at 2.

2

am letting you know that I know about the video. We came here together and the video speaks for us. Whatever the video says, I am for that." Id. at 8.

Around December 15, 2009, the ALAT met with his counterpart in the Pakistani Ministry of the Interior concerning the defendants and asked if the Pakistani government would be "willing to deport the five directly to a USG operated plane in Pakistan for immediate repatriation to the United States," [Dkt. No. 168-1] at 3; however, the ALAT was told that because the defendants had received a consular visit, their detention was now "formal" and "on the books," meaning that Pakistan expected the United States to follow the formal extradition process. Id.

On December 23, 2009, the United States Attorney's Office for the Eastern District of Virginia ("EDVA") filed a criminal complaint against the defendants and obtained arrest warrants for them. [Dkt. No. 1]. The following day, the government filed a motion seeking a limited unsealing order so that "summary information as to the defendants' offense conduct could be taken from the complaint and supporting affidavit and provided to INTERPOL, as required for issuance of a Red Notice/Wanted Person Diffusion Alerts with respect to the warrants issued by the Court for the defendants' arrest."[2] [Dkt. Nos. 6, 7]. On December 30, 2009, the Department of Justice approved the Red Notice applications for all five defendants, which reinforced that "the Red Notice is a firm commitment by your office, and by the United States to request this fugitive's extradition in all but the most exceptional circumstances." [Dkt. No. 168-3] at 3. Under "Action to be taken if traced," the Red Notice for each defendant sought

---

[2] An INTERPOL Red Notice is an international notification to all country members of INTERPOL (of which Pakistan is a member) that a defendant is wanted in the United States on an arrest warrant or court order. See INTERPOL, Red Notices, https://www.interpol.int/How-we-work/Notices/Red-Notices (last visited Apr. 8, 2024).

3

to "locate and arrest [that defendant] with a view to extradition" in "conformity with national laws and/or the applicable bilateral and multilateral treaties." Id. at 7.

On December 24, 2009, the United States Legal Attaché provided copies of the arrest warrants to the Pakistani Ministry of the Interior. [Dkt. No. 168-2]. The Legal Attaché also advised that "[t]he US Government seeks custody of these individuals so that they may stand trial in the US for the charge above and any additional charges that may be added to the complaint. The Legat office is prepared to facilitate the transfer of the five via air transport from Pakistan to the US within a timeframe of 72 hours of notification." Id. at 3. That same day, Pakistan informed the Legal Attaché that "there was a court order from the local court which ordered the Sargodha Fives'[3] detention, prohibiting their transfer to any foreign government." [Dkt. No. 168-4] at 7-8.

On December 28, 2009, the Legal Attaché advised the United States government that an official request from the United States for the transfer of custody of the defendants might carry more weight than simply providing the arrest warrants and advised that the defendants would likely be formally charged in Pakistan on January 4, 2010, for directing terrorist activities. Id. at 8. In response, the Office of International Affairs of the United States Department of Justice ("OIA") and EDVA worked together to provide an official request to Pakistan to turn over the five defendants.[4] Id. This request was issued in the form of a diplomatic note presented to the Pakistani Ministry of Foreign Affairs in Islamabad on January 8, 2010, but due to a

---

[3] Because the defendants were arrested in Sargodha, Pakistan, the Declaration of the Assistant Director at the Office of International Affairs attached to the government's Opposition and other documents refer to the defendants as "the Sargodha Five." [Dkt. No. 168-4] at 7.

[4] According to the Associate Director of the OIA, because the five defendants were United States citizens, the government sought Pakistan's consent to return them home to the United States without requiring a full extradition request. Id. at 8.

4

typographical error in the note, an amended note was presented on January 15, 2010. Id. The diplomatic note requested the transfer by "deportation, expulsion, or other lawful means" of the five defendants. Id. It specifically requested "that the Government of Pakistan consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." Id. at 8-9. There is no evidence in the record of a response from Pakistan to this request; however, on June 5 or 6, 2010, the United States Ambassador to Pakistan met with the Pakistani Minister of Interior to reiterate the United States' position that the defendants should be returned to the United States. Id. at 9.

On June 23, 2010, the Legal Attaché sent a letter to the Pakistani Ministry of Interior about these defendants, repeating that "the US Government has a strong interest in seeing their custody transferred to the United States at the earliest opportunity." [Dkt. No. 168-8] at 2. The letter also reiterated that the defendants could be held in custody "until a US Government aircraft could arrive to transport those who are deported out of Pakistan." Id. Instead of transferring the defendants to the United States, Pakistan quickly prosecuted the defendants all of whom were found guilty on June 24, 2010 of various charges and were sentenced to ten years' imprisonment. [Dkt. No. 29-1]; [Dkt. No. 168-4] at 9.

According to the declaration of Jeffrey Olson, the OIA Associate Director, over the next ten years, the Legal Attaché "routinely inquired with the Pakistan government as to the completion of" the defendants' sentences. [Dkt. No. 168-4] at 10. For example, on March 4, 2013, while the defendants were serving their sentences, the Legal Attaché sent a letter to the Director General of the Federal Investigative Agency in Pakistan regarding the defendants. The letter stressed that the United States government was "interested in discussing a number of

5

pending requests for extradition in Pakistan to the United States, such as" the five named defendants in this case. [Dkt. No. 168-6] at 2.

On November 16, 2017, while the defendants were still serving their sentences in Pakistan, a grand jury in this district charged the defendants in a four-count Indictment with material support offenses. [Dkt. No. 10]. On the same day, new criminal arrest warrants were issued. [Dkt. No. 16].

In November 2019, the Department of Justice learned that the defendants would be released soon. [Dkt. No. 168-4] at 10. On November 22, 2019, in anticipation of the defendants' release from prison in Pakistan, the government filed a motion to appoint counsel for them. [Dkt. No. 17]. In that motion, the government explained that it expected the defendants' sentences in Pakistan to conclude in early January 2020; however, "[i]t [wa]s unclear what the Pakistan government will do upon the defendants' release, including whether the Pakistanis will release the defendants directly to the U.S. State Department." Id. As a result, Judge O'Grady appointed counsel for each defendant. Chaudhry's counsel came from the Federal Public Defendant's Office.[5]

In early December 2019, the OIA Associate Director requested that the Department of State and U.S. Embassy in Islamabad "send a cable to the Pakistan Ministry of Foreign Affairs, noting that it was our understanding that the sentences of the [defendants] were due to expire imminently, and asking for confirmation of that fact so that the U.S. could proceed with extradition or deportation." [Dkt. No. 168-4] at 10.

---

[5] This case was initially assigned to Judge Liam O'Grady and, on September 7, 2022, was randomly reassigned to the undersigned judge following Judge O'Grady's retirement.

Chaudhry was released on June 9, 2020. On June 22, 2020, the Pakistani Ministry of Foreign Affairs sent the U.S. Embassy a diplomatic note requesting extradition documents for Chaudhry and Khan because both defendants held dual Pakistani-U.S. citizenship. Id. at 11. As for the other three defendants, Minni, Zamzam, and Yemer, because they did not have Pakistani citizenship, Pakistan simply required travel documents and airline tickets to facilitate their deportation. Id. On August 17, 2020, Chaudhry's defense counsel confirmed that Chaudhry would contest extradition from Pakistan.

On August 24, 2020, OIA received two sworn copies of the approved extradition requests for Chaudhry and Khan from the United States Attorney's Office. Id. at 11-12. On October 22, 2020, the government filed a motion for certified copies of the defendants' arrest warrants "to effect the foreign transfer of custody of the defendants to the United States Government and to secure their appearance in this District." [Dkt. No. 47]. Judge O'Grady granted the motion the next day. Because of COVID-19 related delays, OIA sent the certified extradition package to the Department of State on October 27, 2020. [Dkt. No. 168-4] at 12.

On the day OIA sent the certified extradition package to the Department of State, the Legal Attaché advised that the December 2009 order prohibiting the defendants' transfer to any foreign government was still in effect and advised that his staff was working with the Pakistani Ministry of Interior to petition the local court to lift the order to facilitate Chaudhry's extradition. Id. On November 9, 2020, the extradition requests were sent to the United States Embassy in Pakistan and were presented to the Pakistani Minister of Foreign Affairs on November 12, 2020. Id.

On May 16, 2021, the Pakistani Federal Secretary of the Ministry of the Interior informed United States authorities that an arrest warrant had been issued for Chaudhry, who had been

7

released from custody, and that his extradition proceedings would begin once he was arrested. Id. at 12-13. Chaudhry was arrested around August 17, 2022. Because he contested extradition, court proceedings commenced in Pakistan. Id. at 13. The Legal Attaché regularly updated OIA on the defendant's extradition proceedings, including court sittings held on November 29, 2022; December 13, 2022; January 12, 2023; March 16, 2023; April 18, 2023; May 24, 2023; and June 13, 2023. Id. Around July 5, 2023, Chaudhry finally consented to extradition, and on September 11, 2023, the Cabinet of Pakistan approved Chaudhry's extradition. Id. Due to "great challenges" in securing transportation for Chaudhry's return, Chaudhry was not extradited from Pakistan to the United States until December 6, 2023. Id. at 13-14. He landed at Dulles International Airport in Virginia that same day and was arraigned in this Court on December 12, 2023. Id. at 14; [Dkt. No. 163].

## II. DISCUSSION

### A. Standard of Review

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy public trial." U.S. Const. amend. VI. The remedy for a violation of the constitutional right to a speedy trial is to dismiss an indictment and to vacate any sentence that has been imposed. Strunk v. United States, 412 U.S. 434, 440 (1973).

In determining whether the right to a speedy trial has been violated, courts must balance four factors: (1) the length of the delay; (2) the government's justification for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972). No factor standing alone is "either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial." Id. at 533.

8

B. <u>Analysis</u>

In his Motion to Dismiss the Indictment, Chaudhry argues that the more than ten-year delay in the government formally requesting his extradition after having filed a complaint against him warrants dismissal of the Indictment for violating his Sixth Amendment right to a speedy trial. [Dkt. No. 165] at 5. More specifically, Chaudhry argues that all four <u>Barker</u> factors weigh in his favor because, despite having been in the custody of a foreign government from 2009 to 2020, the United States did not act with reasonable diligence in seeking his extradition, which has prejudiced his case.[6] <u>Id.</u> at 8-10. In opposition, the government argues that because the second, third, and fourth <u>Barker</u> factors weigh against the defendant, he cannot satisfy his burden of showing a Sixth Amendment violation. [Dkt. No. 168] at 30.

1. <u>Length of Delay</u>

Under the first <u>Barker</u> factor courts must assess whether the length of the government's delay in seeking extradition was uncommonly long. <u>Barker</u>, 407 U.S. at 530. The length of delay is both a factor and "a threshold requirement because the defendant must establish that the length of the delay is at least presumptively prejudicial to trigger the balancing inquiry." <u>United States v. Villa</u>, 70 F.4th 704, 713 (4th Cir. 2023) (citation omitted). Although the Supreme Court of the United States has expressly stated that the right to a speedy trial does not attach until arrest or indictment, <u>United States v. MacDonald</u>, 456 U.S. 1, 6 (1982), the United States Court of Appeals for the Fourth Circuit has interpreted the Sixth Amendment more broadly, holding that the issuance of a criminal complaint, arrest warrant, and detainer triggers a defendant's Sixth

---

[6] Defendant does not challenge any period of delay postdating the submission of the United States government's extradition request.

9

Amendment speedy trial right. See United States v. Thomas, 55 F.3d 144, 149 (4th Cir. 1995); United States v. Woolfolk, 399 F.3d 590, 597 (4th Cir. 2005).

Here, the parties do not contest that the length of the government's delay weighs in defendant's favor, [Dkt. No. 168] at 13; however, they disagree about the precise length of the delay. Defendant argues that, under Fourth Circuit precedent, his Sixth Amendment right attached when the government charged him by complaint in 2009, and as such, there was an 11-year delay in seeking his formal extradition. [Dkt. No. 165] at 7. On the other hand, the government argues that, under Supreme Court precedent, defendant's Sixth Amendment right did not attach until 2017 when he was indicted. [Dkt. No. 168] at 12. Although, as the Fourth Circuit acknowledged in Thomas, this circuit's broad interpretation of Sixth Amendment attachment is in tension with Supreme Court precedent, 55 F.3d at 149 n.4, the Court need not decide whether subsequent decisions have narrowed this circuit's broad interpretation of the Sixth Amendment because, under either party's interpretation of when defendant's Sixth Amendment right attached,—three years or eleven years before seeking extradition— the government's delay was uncommonly long. Doggett v. United States, 505 U.S. 647, 652 n.1 (1992) ("[P]ostaccusation delay [is] 'presumptively prejudicial' at least as it approaches one year."). Accordingly, defendant has satisfied the threshold requirement, and the first Barker factor weighs in his favor.

2. Reason for Delay

Under the second Barker factor courts consider the government's justifications for the delay. Barker, 407 U.S. at 531. The reasons for delay "should be characterized as either valid, improper, or neutral." United States v. Hall, 551 F.3d 257, 272 (4th Cir. 2009). Courts must focus on the intent of the prosecution when examining the reasons for delay. Id. An improper

10

reason for delay, such as government negligence, is "weighted heavily against the government," whereas "[v]alid reasons for delaying a trial are weighted in favor of the [g]overnment." United States v. Grimmond, 137 F.3d 823, 828 (4th Cir. 1998); Barker, 407 U.S. at 531. The government has explained that the delay in extradition resulted from the defendant's arrest, conviction, and sentence in Pakistan, which began in December 2009 and ended in June 2020. [Dkt. No. 168] at 15. Defendant, on the other hand, asserts that because the government did not file a formal extradition request while defendant was incarcerated in Pakistan, the government failed to act with reasonable diligence. [Dkt. No. 165] at 8-9; [Dkt. No. 172] at 3-7.

As an initial matter, that the government did not file a formal extradition request until defendant completed his sentence in Pakistan "is without question a valid reason for delay." Grimmond, 137 F.3d at 828 (citing Thomas, 55 F.3d at 150 ("The need to allow [the defendant] to be prosecuted by the State without interference by the federal government ... [is] an obvious reason for delaying [the defendant's] federal prosecution.")). Chaudhry's claim that the Fourth Circuit's language in Grimmond does not apply because "the Pakistani charges were fraudulent," [Dkt. No. 172] at 3, is of no moment where he provides no support in the record or the law for this assertion.

Although other circuits have held that the government must make a diligent, good faith effort to obtain custody of a defendant when he is being held in a foreign country, "there is no case law to support [defendant's] argument . . . that absent a formal request for extradition from one government to another, there has been no diligent good faith effort." United State v. Walton, 814 F.2d 376, 379 (7th Cir. 1987); see United States v. Diacolios, 837 F.2d 79, 83 (2d. Cir. 1988) ("[W]e are aware of no case that holds that a formal request for extradition must be made before due diligence can be found to have existed"). Moreover, "the government usually

11

satisfies its diligence obligation if it shows that it attempted extradition informally." United States v. Fernandes, 618 F. Supp. 2d 62, 69 (D.D.C. 2009); see United States v. Valencia-Quintana, 136 F. App'x 707, 709 (5th Cir. 2005) (holding that "[a]lthough the government did not formally request extradition," the government satisfied its diligence obligation by "procur[ing] an agreement from Dominican officials to notify the [government] prior to [the defendant's] release" from a Dominican jail).

The uncontested record shows that the government made extensive reasonable efforts to obtain custody of Chaudhry upon his arrest in Pakistan and continued to make numerous requests to the Pakistani authorities for the speedy extradition or deportation of Chaudhry and his co-defendants. As the declaration of the OIA Associate Director established, when Chaudhry was arrested in Pakistan, there was a pattern of United States' extradition requests not being "addressed in a timely manner by the Government of Pakistan, or simply were not addressed at all,"[7] [Dkt. No. 168-4] at 5-6. Moreover, the OIA knew that "in certain cases" Pakistan had agreed "to deport another country's nationals in lieu of extradition," and this method "is typically faster than extradition proceedings." Id. at 5. Because Chaudhry was a United States citizen, the OIA believed this expedited deportation option was available. As a result, the government proceeded with what it understood to be an "expedited option" to obtain custody of Chaudhry and his co-defendants through informal extradition and deportation requests. Id. at 5-6.

Notably, proceeding informally was reasonable given that Article 4 of the United States-Pakistan Extradition Treaty stated that "extradition shall be deferred until the conclusion of the [defendant's] trial and the full execution of any punishment awarded to him," id. at 9, and that

---

[7] Despite making "many other extradition requests to Pakistan" between January 2010 and June 2021, the United States had only one successful extradition from Pakistan, in 2015. Id. at 6.

12

there was no prisoner transfer treaty in place between the United States and Pakistan," id. at 10. Despite these legal hurdles, the United States government nevertheless provided an official request to Pakistan to turn over the five defendants, requesting "that the Government of Pakistan consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." Id. at 8-9. In sum, the government's repeated requests to Pakistan to turn over Chaudhry and his co-defendants clearly demonstrate reasonable diligence, even in the absence of a formal extradition request before 2020.[8]

Defendant's reliance on United States v. Pomeroy, 822 F.2d 718, 722 (8th Cir. 1987), and United States v. Heshelman, 521 F. App'x 501, 508 (6th Cir. 2013), to argue that the government did not act with reasonable diligence is unpersuasive. In Pomeroy, the Eighth Circuit affirmed the dismissal of an indictment where the government knew the defendant's whereabouts for two years but did nothing in the period to extradite him, 822 F.2d at 720 n.4, and in Heshelman, the Sixth Circuit ordered the dismissal of an indictment because it found that actively seeking the defendant's extradition would not have been futile given that the United States had an extradition treaty with Switzerland that covered all the charges at issue and "made only one attempt to" inquire into conditions of extradition. 521 F. App'x at 508. In contrast to the government's conduct in those cases, in this case it made repeated efforts to locate and extradite defendant despite the provision in Article 4 of the United States extradition treaty with Pakistan, deferring extradition until "the full execution of [defendant's] punishment," and despite the local court in Pakistan having barred defendant's transfer to any foreign state's custody. [Dkt. No. 168-4] at 9.

---

[8] The facts in the public record are more than sufficient to establish the government's diligence in seeking the speedy return of Chaudhry to the United States. Moreover, the classified materials reviewed ex parte further corroborate this conclusion. See [Dkt. No. 169].

13

Because "[t]he government is not duty-bound to pursue futile legal gestures to return the defendant for trial," United States v. Mitchell, 957 F.2d 465, 469 (7th Cir. 1992), and because the government reasonably believed Pakistan would not release the defendant until the conclusion of his sentence, its failure to file a premature extradition request does not signify negligent conduct or a failure to act with reasonable diligence.[9] Accordingly, the second Barker factor weighs heavily in favor of the government.

### 3. Defendant's Assertion of the Right

Under the third Barker factor, the Court must weigh the timeliness of defendant's assertion of his Sixth Amendment right to a speedy trial. Barker, 407 U.S. at 531. A "defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right." Id. at 531-32. Defendant argues that, because he filed his Motion to Dismiss the Indictment "within the time period set by the Court," he has timely asserted his constitutional right to a speedy trial. [Dkt. No. 165] at 10. In opposition, the government argues that the defendant's assertion of his Sixth Amendment right is tardy because he actively fought extradition to the United States once released from Pakistani custody, thereby delaying his prosecution for a year. Once he arrived in the United States, he knowingly and voluntarily waived the right to a speedy trial. [Dkt. No. 168] at 25-26.

---

[9] In its supplementary memorandum, defendant attaches a recent opinion from the United States District Court for the Southern District of Iowa, United States v. Palos, 2024 WL 1192315 (S.D. Iowa Mar. 20, 2024), in which the court found that the government's failure to seek the defendant's arrest for six-and-a-half years was negligent, [Dkt. No. 174]; however, as the court in Palos recognized, a government is not negligent in pursuing a defendant where "the [g]overnment continuously sought the defendant." Palo, 2024 WL 1192315, at *4. Here, the Court finds the government's repeated efforts to seek extradition of Chaudhry supports the conclusion that the government was not negligent and acted with reasonable diligence.

14

Chaudhry's conduct from the time of his release from Pakistani custody to the time in which he invoked his right to a speedy trial indicates that he "did not want a speedy trial;" rather, he was "only interested in delaying the trial or avoiding it altogether." United States v. Tranakos, 911 F.2d 1422, 1429 (10th Cir. 1990) ("We are unimpressed by a defendant who moves for dismissal on speedy trial grounds when his other conduct indicates a contrary desire."). Although Chaudhry quibbles about when he became aware of the criminal charges against him in the United States, see [Dkt. No. 172] at 8; [Dkt. No. 174-2], by August 2020 he affirmatively indicated that he would contest extradition to the United States, and as such, between his detention in Pakistan in August 2022 and July 2023, he engaged in myriad proceedings to avoid extradition. See United States v. Cavan, 2016 WL 4098582, at *5 (S.D.N.Y. July 28, 2016) ("Where, as here, 'it is manifestly apparent that a defendant has no serious interest in the speedy prosecution of the charges against him, a court need not ignore the defendant's fugitivity or recalcitrance in determining whether his sixth amendment rights have been violated.'"); United States v. Reumayr, 530 F. Supp. 2d 1200, 1206 (D.N.M. 2007) ("Courts have recognized that a defendant resisting extradition, or otherwise avoiding attempts to bring him to this country, is attempting to avoid going to trial at all in the United States.").

Chauhdry's conduct in the United States fares no better. After consenting to extradition and arriving in the United States, he knowingly and voluntarily waived the right to a speedy trial during his December 2023 arraignment in which he was represented by counsel. [Dkt. No. 163]. This "bolsters the fact that given several opportunities to specifically invoke the right, [defendant] and his counsel declined to do so." Thomas, 55 F.3d at 150. Although explicit waiver of the right to a speedy trial is not dispositive of a Sixth Amendment speedy trial claim, "it is a factor in determining whether the defendant's speedy-trial right has been violated." See

id. Accordingly, in considering defendant's conduct, the assertion-of-right factor weighs against defendant's claim of a speedy-trial violation. See United States v. Lozano, 962 F.3d 773, 781 (4th Cir. 2020) (explaining that the fact that a defendant "didn't assert his right to a speedy trial even after he was released from state custody, learned of the federal charge, and was appointed counsel" weighed against him).

### 4. Prejudice to the Defendant

Under the final Barker factor, the Court must consider whether the defendant was prejudiced by the government's delay. Barker, 407 U.S. at 531. As the Supreme Court has recognized, "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." Doggett, 505 U.S. at 655. In this case there has been no prejudice to Chaudhry, who pleaded guilty on May 2, 2024, under a plea agreement in which the government agreed to recommend a sentence of time-served followed by a 20-year term of supervised release and to allow Chaudhry to appeal the denial of his Motion to Dismiss the Indictment based on the alleged violations of his speedy trial right. Moreover, much like his co-defendants, as soon as he appeared in Court, Chaudhry was released on bond, and given that most of his co-defendants were sentenced to time-served, it appears likely that Chaudhry will be subject to the same sentence.[10]

Accordingly, defendant's vague assertions of harm are insufficient to show actual prejudice, and as such, the fourth Barker factor weighs in favor of the government. Barker, 407 U.S. at 534 (finding "absence of serious prejudice" although the defendant was incarcerated for

---

[10] According to the plea agreements reached with Minni and Zamzam, similarly to Chaudhry's plea agreement, the government agreed to recommend a 20-year term of supervised release for each defendant. All counts against Yemer were dismissed with prejudice due to his medical illness, and Khan is a fugitive who has not yet appeared before the Court.

ten months before trial and was forced to "liv[e] for over four years under a cloud of suspicion and anxiety" because "there [was] no claim that any of [the defendant's] witnesses died or otherwise became unavailable owing to the delay").

### III. CONCLUSION[11]

To prevail on a speedy trial claim, a defendant must establish that, "on balance, [the] four separate factors weigh in his favor." Thomas, 55 F.3d at 148. As discussed above, because defendant has failed to establish that the second, third, and fourth Barker factors support his speedy trial claim, his Motion to Dismiss the Indictment [Dkt. No. 165] has been denied.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 5th day of June, 2024.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

---

[11] Defendant also briefly argues that the government has violated Fed. R. Crim. P. 48(b), which provides that a court "may dismiss an indictment ... if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Defendant's claim is meritless because, as the Fourth Circuit has stated, "Rule 48(b) is 'limited to post-arrest situations.'" United States v. Ball, 18 F.4th 445, 453 (4th Cir. 2021) (quoting United States v. Marion, 404 U.S. 307, 319 (1971)). Even if defendant could invoke Rule 48(b), considering that the government's delay was reasonably justified and did not result in prejudice to defendant's case, there was no unnecessary delay under the Federal Rules of Criminal Procedure.